**UNITED STATES of America, Plaintiff,**

v.

**Rufus SIMS, et al., Defendants.**

**No. 92 CR 166.**

United States District Court,
N.D. Illinois.

Sept. 17, 1992.

Scott T. Mendeloff, Sean B. Martin, U.S. Atty.'s Office, Chicago, IL, for Plaintiff.

Michael Gregory Logan, Chicago, IL, for defendant Rufus Sims.

Daniel S. Alexander, Durkin, Foster, Roberts & Barrett, Chicago, IL, for defendant Donald Moore.

Robert G. Clarke, Chicago, IL, for defendant Michael Stevens.

Standish E. Willis, Chicago, IL, for defendant Delwin Langston.

Richard S. Jalovec, Richard S. Jalovec & Associates, Chicago, IL, for defendant Dennis Gilliam.

Paul Augustus Wagner, Paul A. Wagner, Attorney at Law, Chicago, IL, for defendant William Burch.

Michael Gregory Logan, Chicago, IL, for defendant Timothy Henderson.

William J. Stevens, Chicago, IL, for defendant Darryl Young.

Paul Edward Paprocki, Chicago, IL, for defendant Joe Boyles.

Carl Peter Clavelli, Chicago, IL, for defendant Maurice Harmon.

Robert S. Bailey, Chicago, IL, for defendant Shawn Baker.

Linda Amdur, Chicago, IL, for Dennis Gilliam.

Keith Allan Spielfogel, Chicago, IL, for defendant Estella Sims.

Terence Patrick Gillespie, Marc William Martin, Genson, Steinback & Gillespie, Chicago, IL, for defendant Andrea Thomas.

Herbert Louis Goldberg, Giovannini & Goldberg, Chicago, IL, Sheldon Bart Nagelberg, Chicago, IL, for defendant Ruby Chambers.

Richard A. Halprin, Chicago, IL, for defendant Eric Smith.

## MEMORANDUM OPINION AND ORDER

ALESIA, District Judge.

In this case, nineteen defendants are charged in a nineteen-count indictment with various offenses including conspiracy to possess with intent to distribute heroin and cocaine, money "laundering" and criminal racketeering.[1] Three defendants have filed motions to suppress evidence and requested a hearing.[2] Defendant Donald Moore moves to suppress all evidence, derivative evidence and statements resulting from the execution of search warrants on a house at 1615 South 16th Avenue, Maywood, Illinois (the "1615 South 16th Avenue residence") on February 7, 1989 and on a house at 2606 South Boeger Avenue, Westchester, Illinois (the "South Boeger Avenue residence") on February 7, 1989. Moore also moves to suppress any evidence seized and statements made during his arrest on March 5, 1992. Defendant Estella Sims[3] moves to suppress all evidence recovered from the execution of a search warrant on a house at 241 North Waller Street, Chicago, Illinois (the "North Waller residence") on April 6, 1989. Defendant Andrea Thomas moves to suppress all evidence, derivative evidence and statements resulting from the execution of a search warrant on the residence at the South Boeger Avenue residence. Thomas also moves to suppress all evidence seized by police and government agents during an encounter at the Forest Park National Bank, in Forest Park, Illinois, on February 10, 1989 and all evidence obtained from certain safe deposit boxes located at Western National Bank, Clyde Federal Savings and Oak Park Trust Bank. Defendants Joe Boyles, Ruby Ann Chambers and Andrea Thomas have filed motions to adopt the pre-trial motions of their co-defendants, including the three motions to suppress.[4]

1. Some of the underlying Racketeering activities alleged include: possession with intent to distribute cocaine and heroin (Racketeering Acts Nos. 1–7, 13–14), money laundering (Racketeering Act Nos. 8–9, 11–12, 15–17), and murder (Racketeering Act No. 10). The indictment also includes a forfeiture count.

2. There are other pre-trial motions filed by these and other defendants. This memorandum opinion addresses only the motions to suppress.

3. Rufus Sims, also named in the indictment, is a fugitive. References to Sims in this opinion refer to Estella Sims.

4. Defendant Delwin Langston's Motion for joinder in defendant Moore's Motion to Suppress was denied on July 9, 1992.

## I. FACTS [5]

### A. *The Perjured Affidavit*

During January of 1989, the United States Drug Enforcement Agency ("DEA") instituted an investigation into an alleged drug organization headed up by defendant Rufus Sims. According to the government, Rufus Sims operated a heroin and cocaine distribution network known as the "Four Corner Hustlers" in the Austin area of Chicago, Illinois. Unrelated to this investigation, on February 7, 1989, Chicago Police Department ("CPD") officers arrested an individual (the "CI") on drug trafficking charges.[6] The CPD officers told the CI that he would be prosecuted unless he disclosed names of individuals who he knew to possess illegal firearms. The CI stated that he knew Rufus Sims stored firearms at 1615 South 16th Avenue, Maywood, Illinois and that he had seen firearms there approximately one year earlier. The CI also told the CPD officers that he had accompanied Rufus Sims to other "dope house" locations, that he knew Rufus Sims owned the 1615 South 16th Avenue home, that Rufus Sims' girlfriend lived there, and that Rufus Sims used the home as a drug dealing location.

The CPD officers prepared an affidavit to support the issuance of a search warrant for the 1615 South 16th Avenue home. The government admits that the affidavit, as attested to by the CI, contained false information. The government states that the CI later told federal authorities:

> [T]he police told him that they wanted him to sign an affidavit to the above facts, except that they wanted him to tell the judge that he had seen the guns at [1615 South 16th Avenue,] Maywood address two days earlier. According to the

[CI], he told the police that Sims might have moved the firearms. According to the [CI], the officers asked where Sims would have moved the guns. The [CI] stated that Sims would probably have moved the guns to Sims' new residence at 2606 South Boeger in Westchester. The police told the [CI] that they wanted him to say that he had also gone to the Boeger address with Sims two days earlier and seen the guns there, as well. Police told the [CI] that he would not be prosecuted for the narcotics charge if he swore to the altered affidavit. The [CI] did so and was not prosecuted or charged with the narcotics offense. On the basis of the [CI's] information, police officers obtained a state search warrant for the [2606 South Boeger,] Westchester and [1615 South 16th Avenue,] Maywood addresses.

Government's Response, at 8. The government admits that at the time the police officers obtained the search warrant from the state court judge, the officers knew that the statements in the affidavit were false.

### B. *The 1615 South 16th Avenue and 2606 South Boeger Avenue Searches*

On February 7, 1989, CPD police officers executed the search warrant at the 1615 South 16th Avenue address seizing numerous firearms and explosives. Jacqueline Moore, defendant Donald Moore's wife, present at the time of the search, was arrested by the police and made a statement.[7] At the time of the search, Donald Moore was incarcerated for an unrelated state criminal sentence.

Also on February 7, 1989, CPD police officers executed the search warrant at the

---

**5.** Unless otherwise noted, the facts are taken from the Government's Response to Defendants' Motions to Suppress Evidence, at 2–16 [hereinafter the Government's Response]. Only defendant Moore filed a Reply to the Government's Response. Moore states that he has submitted an outline of detailed and specific facts which differ from those proposed by the government. The supporting memorandum to Moore's Motion to Suppress Evidence contains a "Proffer of Facts to Be Adduced at Hearing". *See* pages 1–2. Specifically, Moore's version of facts regard-

ing his March 5, 1992 arrest differ from that presented by the government.

**6.** The government identified that individual as Robert Lewis, but this is not the individual's real name. The fictitious name was used as a means of protecting the identity of the confidential informant.

**7.** Jacqueline Moore is not a defendant in this case.

2606 South Boeger Avenue address seizing numerous firearms; 23 clear plastic vials later found to contain cocaine; large amounts of currency; titles to several automobiles; several safe deposit box keys from Forest Park National Bank, Clyde Federal Savings, Western National Bank, Oak Park Trust Bank, Uptown National Bank and First Suburban Bank; airline tickets; miscellaneous documents in the name of Rufus Sims; an alleged drug ledger; and other financial records purporting to detail Rufus Sims' drug transactions. Defendant Andrea Thomas was present at the 2606 South Boeger Avenue residence at the time of the search, and the government informed her of her *Miranda* rights before questioning her.

## C. *The Forest Park Bank Search*

The government states that on February 9, 1989, CPD police officers contacted Forest Park National Bank, the Western National Bank and Clyde Federal Savings. The government alleges that each of the banks informed the officers that "a woman had contacted the bank and said she had lost the keys to her safe deposit box and needed to gain entry to the box before the weekend. The boxes that this woman sought entry to were the same boxes that matched the respective keys seized during the [2606 South Boeger Avenue residence] search." Government Response, at 10. The following day, a confidential informant[8] allegedly informed police officers that Andrea Thomas would be going to the Forest Park National Bank and would attempt to remove the contents of several safe deposit boxes. While keeping the bank under surveillance, police officers observed Andrea Thomas and Estella Sims enter and leave the bank, return to the bank with an empty large black satchel, and leave the bank with the satchel appearing full and heavy. When police officers approached the two women, Sims, who was carrying the satchel, allegedly disclaimed

ownership of the satchel and knowledge of its contents. The satchel contained $113,553 in cash. The officers also observed Thomas drop an envelope she had been carrying and attempt to conceal a cloth bag in her blouse. The government states that when Thomas was questioned about the cloth bag, "Thomas denied knowledge of what was in the cloth money bag and added that if it was money it was not hers. The bag was recovered from her blouse and it contained $5,120 in cash. Officers then recovered the dropped envelope, which contained a safe deposit box key for the box at Western National Bank." Government's Response, at 11.

## D. *Search of Safe Deposit Boxes*

On February 10 and 11, 1989, federal agents and other law enforcement personnel executed federal search warrants on some of the safe deposit boxes corresponding to the keys seized at the 2606 South Boeger Avenue residence. The government seized the following: $152,645 from a safe deposit box at Clyde Federal Savings registered to Veronica Washington and Gloria Smith; $30,040 from a safe deposit box at Western National Bank registered to Ana Jones and Gloria Washington; $22,400, jewelry and miscellaneous papers from a safe deposit box at Oak Park Trust Bank registered to Estella Greenfield and Violate Sims. It is unclear to the Court whether any of these names is an alias of any of the defendants.[9] None of the defendants have suggested that they are the registered parties on the safe deposit boxes searched.

## E. *Search of the 241 North Waller residence*

On April 6, 1989, federal agents searched the residence at 241 North Waller, Chicago, Illinois pursuant to a federal search warrant issued by Magistrate Judge Lefkow. The federal search warrant was based upon affidavits submitted by several CPD officers. The affidavits detailed the re-

---

**8.** This is not the same "CI" that provided the information for the affidavit in support of the state court search warrant.

**9.** In some of the affidavits supporting the federal search warrant of 241 North Waller, Rufus Sims' mother is identified as Estella Greenfield. In the Government's Response, Rufus Sims' mother is identified as Estella Sims.

sults of the searches made at the 1615 South 16th Avenue and 2606 South Boeger Avenue residences and also the results of the searches of the various safe deposit boxes. (Roy Affidavit, at ¶¶ 2–4; Lombardo Affidavit, at ¶¶ 1–17). The affidavit of CPD police officer Roy also detailed information provided by three confidential informants who indicated that Rufus Sims was a large-scale cocaine and heroin dealer who lived with his mother (Estella Sims) at the 241 North Waller address. As a result of the search of the 241 North Waller address, government agents seized $34,852 in currency, alleged drug-sale records, and a large color photo of Rufus and Steven Sims wearing what the government considered to be hundreds of thousands of dollars of jewelry.

### F. Defendant Moore's Arrest

On March 5, 1992, defendant Moore was arrested by federal authorities. The government submits that Moore was being observed by federal agents on Lake Street in Chicago, Illinois, in anticipation of the indictments being handed down in this case. The government alleges that the federal agents observed Moore sitting in his car [10] engaging in "hand-to-hand" drug transactions between Moore and other unidentified individuals who approached the car. At approximately 3:00 p.m., Moore started to drive away in the car. The federal agents pulled over Moore's car. The government maintains that the agents stopped Moore based upon their suspicion that Moore was engaged in drug transactions. The agents questioned Moore about what he was doing in the area. Moore states that he told the agents that he was attempting to have his car repaired. Memorandum of Law and Fact in Support of Defendant Moore's Motion to Suppress Evidence, at 2 [hereinafter Moore's Memorandum in Support]. The government states that the agents then conducted a pat-down *Terry* search. The agents detected a "bulge" in Moore's jacket pocket which turned out to be a wad of currency. When asked by the government agents how much money was in the wad of currency, Moore allegedly replied "$150.00." According to the government, the wad contained $775.00. The government states:

> The officers told Moore that they had to subject the money to a drug dog sniff test because it was suspected narcotics proceeds. They asked Moore and Langston if they wanted to go to the 15th District police station where the sniff test would be performed, and Moore and Langston replied that they would voluntarily accompany the officers to the station. Once at the station, a drug dog alerted on the cash, indicating the presence of drug residue on the money. The money was inventoried, at which time a DEA agent informed the police officers that Moore and Langston had been indicted in connection with the [Rufus] Sims drug conspiracy. Both [Moore and Langston] were then arrested and taken into federal custody.

Government's Response, at 15–16.

Moore's description of his arrest differs from the government's version. Moore states:

> He was told that he would have to accompany the officers to the 15th District police station, which he did. During the trip to the station, and at the police station, Moore was further questioned. At no time was Moore read his *Miranda* rights until after he was taken into Federal Custody. Moore never signed a waiver of rights form.

Moore's Memorandum in Support, at 2.

### II. DISCUSSION

The Fourth Amendment states that "[t]he right of the people to be secure in their persons, homes, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but on probable cause, supported by Oath and affirmation, and

---

**10.** The government alleges that another of Rufus Sims' alleged gang members was also in the car at the time. Moore states that at the time of his arrest, he, an auto mechanic, a female friend and co-defendant Delwin Langston were in the car. Moore claims that at the time of his arrest, he was attempting to have his automobile repaired.

particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. For each search and seizure challenged by the defendants in this case, the Court must first determine the parties' "standing"[11] to move to suppress evidence pursuant to the Fourth Amendment. If the Court finds that a party has standing, the Court must determine whether a hearing is necessary to resolve factual issues in dispute. If a hearing is unnecessary, the Court can rule on the motions to suppress.

## A. *Standing*

■ To challenge a search or seizure as violative of the Fourth Amendment, a defendant must show that he or she has a legitimate expectation of privacy in the property searched or seized. *Rawlings v. Kentucky*, 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980); *Rakas*, 439 U.S. at 143, 99 S.Ct. at 430. "Unless and until the 'standing' threshold is crossed, the *bona fides* of the search and seizure are not put legitimately into issue." *Aguirre*, 839 F.2d at 854. The test for standing under the Fourth Amendment has two components: (1) whether the individual, by his conduct, has exhibited a subjective expectation of privacy; and (2) whether such an expectation is justifiable in the circumstances. *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979); *United States v. Duprey*, 895 F.2d 303, 309 (7th Cir.1989). The Seventh Circuit Court of Appeals has indicated that a court should consider several factors when answering the above two questions: (1) whether the defendant has a possessory interest in the place searched; (2) whether he or she has a right to exclude others therefrom; (3) whether he or she has exhibited a subjective expectation that the place remain free from governmental invasion; and (4) whether normal precautions were taken to protect the privacy of the place. *Duprey*, 895 F.2d at 309 (citing among other authorities *United States v. Peters*,

791 F.2d 1270, 1280 (7th Cir.), *cert. denied*, 479 U.S. 847, 107 S.Ct. 168, 93 L.Ed.2d 106 (1986)).

■ As noted above, three defendants make specific motions to suppress evidence while several other defendants move to adopt the pre-trial motions of their co-defendants, including these motions to suppress. We first consider the motions to adopt the suppression motions of co-defendants by defendants Boyles, Chambers and Thomas. It is this court's practice to require any party who moves to adopt motions of co-defendants to specify by title exactly which motions of his co-defendants he seeks to adopt. It is not this court's duty to sift through the various pretrial motions and divine which motions of a co-defendant another defendant seeks to adopt or which motions of a co-defendant are applicable to another defendant. Therefore, barebones motions to adopt are routinely denied.

Furthermore, neither Boyles nor Chambers has indicated to the court any degree of legitimate expectation of privacy in the areas searched or the property seized by the government. Nor have they indicated any type of ownership or possessory interest in the evidence sought to be suppressed. To the extent these defendants suggest that the evidence should be suppressed under the "fruit of the poisonous tree" doctrine, this argument fails because Fourth Amendment violations "can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence." *Alderman v. United States*, 394 U.S. 165, 171–72, 89 S.Ct. 961, 965, 22 L.Ed.2d 176 (1969). The court concludes that defendants Boyles and Chambers lack standing to challenge the evidence seized from the residences in question. To the extent the defendants seek suppression of this evidence through their motions to adopt, the motions are denied.

11. The term "standing" is a short-hand reference to the requirement that a defendant have a legitimate expectation of privacy in the property searched and/or seized. *See, e.g., Rakas v. Illinois*, 439 U.S. 128, 140–50, 99 S.Ct. 421, 428–34, 58 L.Ed.2d 387 (1978); *United States v. Aguirre*, 839 F.2d 854, 856 (7th Cir.1988).

■ Defendant Moore moves to suppress the evidence seized at the 1615 South 16th Avenue residence. The court concludes that Moore has standing to challenge this search. The government asserts that "no defendant has demonstrated by cognizable evidence a legitimate expectation of privacy in either the Westchester or Maywood residences, which are the primary lightening rods for the various motions to suppress because of the partially tainted affidavit." Government's Response, at 19–20. However, it is uncontroverted that the 1615 South 16th Avenue residence was Moore's home. The government argues that Moore's incarceration at the time of the search eliminates his expectation of privacy in his home. This is not self-evident, and the government's lack of support for this proposition is telling. *See* Government's Response, at 20 n. 8. Despite Moore's absence from his home, for whatever reason, Moore still retains a possessory interest in the home and its contents. Although prisoners cannot physically prevent a person from entering their homes, they retain the legal right to exclude others from their homes. The court concludes that Moore had a legitimate expectation of privacy in the residence at 1615 South 16th Avenue, Maywood, Illinois at the time it was searched. Hence, Moore has standing to challenge on Fourth Amendment grounds the evidence seized during that search.[12]

■ Defendants Moore and Thomas move to suppress the evidence seized at the South Boeger Avenue residence. Because neither defendant had a legitimate expectation of privacy in the South Boeger Avenue residence, the court finds that the defendants lack standing to challenge on Fourth Amendment grounds the search of the South Boeger Avenue residence. Unlike Moore's relationship to the 1615 South 16th Avenue residence, Moore has not asserted an ownership or possessory interest in the South Boeger Avenue residence or its contents. Thomas was present at the time government agents searched the South Boeger Avenue residence, but her presence at the time of the search does not establish a legitimate expectation of privacy in that residence. In *Rakas*, the Supreme Court rejected the "legitimate presence" test set forth in *Jones v. U.S.*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). *Rakas*, 439 U.S. at 132–44, 99 S.Ct. at 424–31. The *Rakas* Court reasoned that such a test might allow standing to a "casual visitor who has never seen, or been permitted to visit, the basement of another's house to object to a search of the basement if the visitor happened to be in the kitchen of the house at the time of the search." *Rakas*, 439 U.S. at 142, 99 S.Ct. at 430. Since Thomas has alleged no other facts in support of her alleged expectation of privacy in the home at South Boeger, Thomas has not met her burden of establishing an expectation of privacy in the property searched. Therefore, both Thomas and Moore lack standing to challenge the search and seizure of property at the South Boeger Avenue residence on Fourth Amendment grounds.

■ Thomas also challenges the seizure of evidence by government agents which occurred on February 10, 1989 outside the Forest Park National Bank. Thomas objects first to the seizure of the currency "from their persons." Memorandum of Law in Support of the Motion to Quash Search Warrant, Suppress Evidence [sic] Suppress Derivative Evidence and Suppress Statements, at 3 [hereinafter Thomas' Memorandum in Support]. Thomas also moves to suppress all evidence which was seized as a result of the bank records and safe deposit keys seized at the South Boeger Avenue residence. Specifically, Thomas moves to suppress "physical evidence regarding the [sic] safety deposit boxes and vehicles ..., physical evidence and testimonial evidence stemming from the seizure of Andrea Thomas around Forest Park [National] Bank on February 10, 1989 ... [and] the evidence seized from [sic] safety deposit boxes at the Western

---

12. Moore also has standing to challenge the search of his person by government agents prior to his arrest on March 5, 1992. We discuss the merits of Moore's suppression motion in this regard below.

National Bank, Clyde Federal Savings and Oak Park Trust Bank...." Thomas' Memorandum in Support, at 6. As noted above, Thomas lacks standing to object to the search and seizure of property at the South Boeger Avenue residence. Hence, Thomas also lacks standing to challenge evidence which was derivatively seized as a result of the South Boeger Avenue search. There exists "no authority that holds that a defendant may suppress evidence seized from him as a fruit of a violation of fourth amendment rights which he does not have standing to challenge." *United States v. Williams,* 565 F.Supp. 353, 362 (N.D.Ill. 1983). The court concludes that Thomas lacks standing to challenge the evidence seized from the safe deposit boxes.

■ Since Thomas disclaimed ownership of the currency found on her person when government agents confronted her outside the Forest Park National Bank, Thomas disavowed any expectation of privacy and extinguished any standing she might have had to challenge the government's seizure of this evidence.[13] The government recounts that after being approached by government agents and questioned about the contents of the cloth money bag, Thomas "denied knowledge of what was in the cloth money bag and added that if it was money it was not hers." Government's Response, at 39 (emphasis deleted). Thomas has not contradicted the government's statement or provided a version of

events different from that given by the government. A defendant's denial of ownership of an item of property is sufficient to preclude any assertion by a defendant of a privacy interest in the property. *United States v. Rush,* 890 F.2d 45, 48 (7th Cir. 1989). Hence, Thomas lacks a legitimate expectation of privacy in the cloth money bag; therefore, she lacks standing to challenge its seizure on Fourth Amendment grounds.[14]

■ We next consider Estella Sims' standing to challenge the search of the residence at 241 North Waller Street. It is uncontradicted that Sims partially owned and resided at the residence at 241 North Waller Street. Sims argues that the evidence seized at 241 North Waller Street should be suppressed as the fruit of the poisonous tree of the searches of the 1615 South 16th Avenue and the South Boeger Avenue residences. Sims misperceives the fruit of the poisonous tree doctrine. In the case announcing this doctrine, *Wong Sun v. U.S.,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), defendant Toy was arrested without probable cause and subjected to an illegal interrogation. The court held inadmissible against Toy the fruit of this interrogation, heroin seized from defendant Yee, since it was the fruit of his illegal arrest. *Wong Sun,* 371 U.S. at 487-88, 83 S.Ct. at 417-18. The heroin was held admissible against defendant Wong Sun, however, because "[t]he seizure of this her-

**13.** Thomas' statements made outside the Forest Park National Bank do not constitute "fruit of the poisonous tree" that should be suppressed as derivative evidence from the warrant obtained with the perjured affidavit. As stated above, Thomas does not have standing to challenge the search at the South Boeger Avenue residence. Furthermore, the government had an independent source for the evidence that led police to the Forest Park National Bank and would have inevitably discovered it. Although police targeted certain banks based on the safe deposit box keys recovered during the South Boeger Avenue search, police officers also received independent information from a confidential informant that Andrea Thomas would be going to the bank "to remove the proceeds of drug moneys generated by the Sims drug organization...." Government's Consolidated Response to Defendants' Pretrial Motions, at 37. The suspicious actions of Thomas and Sims observed by the police

outside the bank justified the officers in approaching and questioning them. After the officers identified themselves, Thomas and Sims agreed to speak to the officers in a consensual, non-custodial interview. The defendants do not present facts to the contrary. Therefore, the Court denies the motion to suppress Thomas' statements.

**14.** Although not mentioned in Thomas' motion, the same result would follow for the envelope and satchel allegedly dropped by Thomas and Sims in the bank parking lot. By dropping the envelope, defendants effectively abandoned the envelope and its contents (a safe deposit key) and thus have no legitimate expectation of privacy in these items. The same is true of the contents of the satchel. Hence, Thomas and Sims lack standing to object to the seizure of these items on Fourth Amendment grounds. *Rush,* 890 F.2d at 48.

oin invaded no right of privacy of person or premises which would entitle Wong Sun to object to its use at trial." *Wong Sun,* 371 U.S. at 492, 83 S.Ct. at 419. Sims argues that the taint of the affidavit falsely procured to search the 1615 South 16th Avenue and the South Boeger Avenue residences infected the affidavit which supported the issuance of the search warrant for the 241 North Waller Street house. Hence, Sims argues that any evidence seized at the 241 North Waller address was the fruit of the illegal searches at the 1615 South 16th Avenue and the South Boeger Avenue residences.

Sims' argument extends the holding of *Wong Sun* too far. As noted above, Wong Sun lacked standing to challenge the illegal seizure of heroin as a result of Toy's illegal arrest because Toy's arrest did not invade a right of privacy possessed by Wong Sun. Similarly, Sims has no legitimate expectation of privacy in any of the homes searched as a result of the perjured search warrant. Therefore, Sims' objection to the admissibility of the fruits of those allegedly illegal searches providing the underlying basis for the warrant issued authorizing the search of the 241 North Waller Street residence must fail. "When a defendant is aggrieved by an allegedly illegal search of a third party's property, the Fourth Amendment rights of *that* defendant have not been infringed." *United States v. Knox,* 839 F.2d 285, 293 (6th Cir.1989), *cert. denied,* 490 U.S. 1019, 109 S.Ct. 1742, 104 L.Ed.2d 179 (1989) (emphasis added). Neither can Sims successfully challenge the search warrant for the residence at 241 North Waller Street based upon any knowingly false statement contained in the affidavit supporting *that* search warrant since the affidavit does not contain any false statement. *See Franks v. Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676–77, 57 L.Ed.2d 667 (1978).[15]

With respect to the various standing issues, the court concludes that defendant Moore has standing to challenge the search of his 1615 South 16th Avenue residence.

Moore also has standing to challenge the search of his person by government agents prior to his arrest on March 5, 1992. No other movant has standing to challenge any of the evidence sought to be suppressed pursuant to the Fourth Amendment. We next consider whether any of these remaining suppression issues requires a hearing.

## B. *Necessity of a Hearing*

The necessity of an evidentiary hearing on a motion to suppress turns on the question of whether any factual issue necessary to dispose of the motion is in dispute. *United States v. Rollins,* 862 F.2d 1282, 1291 (7th Cir.1988), *cert. denied,* 490 U.S. 1074, 109 S.Ct. 2084, 104 L.Ed.2d 648 (1989) (district court is not required to conduct an evidentiary hearing on every motion to suppress). "Furthermore, to justify a hearing, the facts presented in the motion must be definite, specific, detailed, and nonconjectural." *Rollins,* 862 F.2d at 1291 (citation omitted). The court concludes that only the issue of defendant Moore's search and arrest on March 5, 1992 requires an evidentiary hearing.

As detailed in part I.F. above, the government and Moore present markedly different versions of the events surrounding the government agents' search and arrest of Moore. Moore claims to have been legally driving his automobile in an effort to have it repaired. The government agents claim to have observed Moore engaging in illegal narcotics transactions, thus providing the reasonable suspicion necessary to make a stop pursuant to *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). There is also the question of when Moore was taken into custody by the government, a factual dispute acknowledged by the government. *See* Government's Response, at 45 n. 17. Therefore, the court will conduct an evidentiary hearing on the question of the legality of Donald Moore's search and subsequent arrest.

---

**15.** Even if the statement in Officer Roy's affidavit in support of the 241 North Waller warrant which summarizes the basis for the South Boe- ger warrant could be construed as false, which it is not, the remainder of the affidavit is sufficient to establish probable cause.

■ As to Moore's motion to suppress the evidence seized at the 1615 South 16th Avenue residence, the court concludes that an evidentiary hearing is not necessary. There exists no factual dispute that would require a hearing since Moore attacks the search on the basis of false information provided in the affidavit supporting the search warrant. As to the 1615 South 16th Avenue residence search warrant, the government has conceded the falsity of the underlying affidavit. Hence no hearing pursuant to *Franks v. Delaware* is necessary. Having concluded that no evidentiary hearing is necessary for the resolution of this motion, the court now turns to the merits of defendant Moore's arguments in favor of suppression.

### C. *Suppression of the Evidence Seized at the 1615 South 16th Avenue residence*

■ Defendant Moore argues that the inclusion of perjured testimony in the affidavit supporting the search warrant of the 1615 South 16th Avenue residence requires suppression of all evidence seized as a result of this search. Under *Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676–77, 57 L.Ed.2d 667 (1978), a search warrant may be voided if three conditions exist: (1) a factual statement in the affidavit is false; (2) the false statement was made knowingly or intentionally; and (3) "without the false statement, the remainder of the affidavit is insufficient to establish probable cause." *United States v. McNeese*, 901 F.2d 585, 594 (7th Cir.1990). The government concedes the first two elements. The government admits that with respect to the statements attributed in the affidavit to the CI, the CI had not seen guns in the 1615 South 16th Avenue residence or the South Boeger Avenue residence two days prior to the date of the affidavit, but had only seen firearms in the 1615 South 16th Avenue residence approximately one year prior to the date of the affidavit. The government also admits that the false statement was made knowingly. *See* Government's Response, at 25–26.

■ The court must focus therefore on the third element of *Franks*: whether without the false statement, the remainder of the affidavit is insufficient to establish probable cause. "An affidavit has made a proper showing of probable cause when it sets forth facts sufficient to induce a reasonably prudent person to believe that a search thereof will uncover evidence of a crime." *McNeese*, 901 F.2d at 592 (citing *Berger v. New York*, 388 U.S. 41, 55, 87 S.Ct. 1873, 1881–82, 18 L.Ed.2d 1040 (1967)). "In deciding whether a search warrant is supported by probable cause, courts must use the flexible totality-of-the-circumstances standard set forth in *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983)." *McNeese*, 901 F.2d at 592. We agree with the government's contention that there is a sufficient basis to conclude that the search warrant authorizing the search of the 1615 South 16th Avenue residence was supported by probable cause even without the false testimony contained in the affidavit.

As the government notes, the only false information in the affidavit was that the CI had seen firearms in the 1615 South 16th Avenue and the 2606 South Boeger residences two days earlier. The CI had actually seen firearms only in the 1615 South 16th Avenue residence approximately one year earlier. The rest of the CI's affidavit was accurate. The CI had known Rufus Sims for more than five years; the CI had seen Rufus Sims store firearms at the 1615 South 16th Avenue residence; the CI knew Rufus Sims was a member of the street gang known as the "Four Corner Hustlers"; Rufus Sims had taken the CI to the 1615 South 16th Avenue residence and shown him firearms including a fully loaded UZI machine gun; Rufus Sims told the CI that he kept the guns at the house to protect the house against rival gangs; and the CI knew Rufus Sims transacted narcotics out of the 1615 South 16th Avenue residence. Other information in the affidavit established that Rufus Sims had several felony convictions.

■ The age of the information in a search warrant affidavit is a factor to be

 

considered but is not determinative. *United States v. Certain Real Property,* 943 F.2d 721, 724 (7th Cir.1991). Courts have upheld search warrants based upon so-called "stale" information. *See, e.g., McNeese,* 901 F.2d at 597 (listing cases from five months to nine months); *United States v. Batchelder,* 824 F.2d 563, 564 (7th Cir.1987) (noting average age of firearm search warrants in the Northern District of Illinois is eleven months). "Moreover, when a conspiracy to distribute drugs is ongoing for years, and is clearly an activity protracted and continuous in nature, the passage of time between the last act and the application for the warrant diminishes in significance." *McNeese,* 901 F.2d at 597 (citing *Andresen v. Maryland,* 427 U.S. 463, 478 n. 9, 96 S.Ct. 2737, 2740 n. 9, 49 L.Ed.2d 627 (1976)). Given the alleged ongoing nature of the "Four Corners Hustlers", the passage of time does not render the information stale. Therefore, the Court concludes that probable cause existed in spite of the false information in the affidavit and the search warrant was valid.

### III. CONCLUSION

In summary, the Court denies the Motions to Adopt the suppression motions of their co-defendants filed by defendants Boyles, Chambers and Thomas. The Court denies the Motions to Suppress Evidence seized at the South Boeger residence filed by defendants Moore and Thomas since they lack standing to challenge on Fourth Amendment grounds the underlying search upon which their motions are based. Thomas' Motion to Suppress Evidence seized outside the Forest Park National Bank is denied since Thomas had no expectation of privacy in that evidence and no standing to challenge the search. Sims' Motion to Suppress Evidence seized during the 241 North Waller Street search is denied since Sims lacks standing to challenge the searches at the South 16th Avenue and South Boeger residences. The Court denies defendant Moore's motion to suppress evidence seized at the 1615 South 16th Avenue residence because the Court concludes that the search warrant authorizing the search was supported by probable cause

even without the false testimony contained in the affidavit. An evidentiary hearing will be held to resolve the factual disputes necessary to dispose of defendant Donald Moore's Motion to Suppress Evidence seized during his arrest on March 5, 1992. All other Motions to Suppress Evidence, as noted above, are denied.